In re SPINASSE.
Patent Appeal No. 3227.

Court of Customs and Patent Appeals.
March 5, 1934.

Raymond J. Mawhinney, of Washington, D. C., for appellant.

T. A. Hostetler, of Washington, D. C. (Howard S. Miller, of Washington, D. C., of counsel), for the Commissioner of Patents.

Before GRAHAM, Presiding Judge, and BLAND, HATFIELD, GARRETT, and LENROOT, Associate Judges.

GRAHAM, Presiding Judge.

The appellant has filed his application in the United States Patent Office for a patent upon certain claimed improvements in means and method for treating glass, especially glass sheets or plates. Certain claims were allowed to the appellant, applicant, but claims 50, 51, 54, 55, 56, 58, 59, 62, 63, and 64 were disallowed by both tribunals in the Patent Office, and the decision as to these was appealed to this court. On the hearing here, the appeal was dismissed as to said claim 64, on the motion of counsel for appellant. Claims 50 and 56 are device claims, while the remaining claims are for a method.

Appellant's device and method concern the treatment of plates or sheets of glass as they are drawn from the molten glass in a glass bath, and are intended to obviate the formation of longitudinal cracks in the plate of glass as it is drawn. It is admittedly known to the art that as plates or sheets of glass are drawn from the furnace, cracks are apt to appear as the result of the cutting of the sheet, and these may extend longitudinally of the plate of glass behind the point of cutting to the limit of the annealed portion of the glass. To overcome this difficulty, the appellant has devised the apparatus and method disclosed in his drawings, namely, that when the glass is drawn from the bath it is conducted through rolls between a pair of fireproof belts, preferably made of asbestos fabric, and which said belts move around oppositely disposed rolls. Placed within these asbestos belts, at desired places, are transverse flat strips of high electrical resistance, such as nichrome. As the asbestos belts move forward with the sheet of glass, these flat nichrome strips, which are continuously heated by electricity, come in contact with the surface of the plate of glass and move forward with the glass until disengaged therefrom at the point where the belts turn outward and away from the glass. This, however, is a matter which will be hereinafter discussed with reference to claim 50.

These heated nichrome strips, it is said, form heated strips in the glass sheet prior to, and at the time of, the cutting of the sheet of glass above the belts, so that cracks, if generated by the cutting operation, will not travel backward in the sheet farther than this heated area. It is stated in appellant's specification: "The strips may be arranged at regular interval—so that at least one of them will come in engagement with the face of the sheet as or before the one in advance moves out of contact." The object of this, it is said, is to insure that there will be always a heated area in the glass, back of the point of cutting.

Claims 50, 51, 56, and 62 are thought to be sufficiently typical of all the rejected claims, and are as follows:

"50. A device for arresting cracks in sheet glass during drawing comprising a pair of endless carriers, and a plurality of heated strips mounted in spaced relation on the carriers and adapted to register on opposite sides of the glass sheet during the movement of the carriers, the pairs of registering strips being so positioned relatively to one another on the carriers with at least one pair of the strips while in the heated condition is always maintained by the carriers in heating relation to a transversely extending zone of the sheet between the cutting station and the source from which the sheet is drawn.

"51. The method of arresting cracks in

sheet glass during drawing which consists in heating the glass sheet during the cutting operation along a transverse line between the cutting station and the point where the glass becomes set in the sheet."

"56. In apparatus for drawing sheet glass, a nonnicking flat strip, means for passing an electric current through said strip for heating the strip, and a mechanically operated carrier means for maintaining said electrically heated strip with the flat side thereof in contact with the surface of the drawn sheet while the sheet is being cut to intercept a longitudinally extending crack in the sheet."

"62. The method of annealing glass, which consists in drawing the glass, allowing the glass to cool to an initial annealing temperature, then raising the temperature of the glass rapidly and for a short period of time, subsequently allowing the glass to cool to a lower temperature than the initial annealing temperature, then again raising the temperature of the glass though not to such a high a degree as previously, and allowing the glass to cool."

The Board of Appeals rejected the claims upon the following references:

George et al., 891,924, June 30, 1908.
Campbell, 1,367,858, February 8, 1921.
Slingluff, 1,373,533, April 5, 1921.
Slingluff, 1,544,947, July 7, 1925.

In discussing these references, claim 50 was rejected as involving new matter beyond that originally disclosed in the application. Claims 51 and 55 were rejected on the Campbell reference, while claims 54 and 56 were rejected on the reference Campbell, in view of Slingluff, No. 1,373,533. Claims 58, 59, 62, and 63 were rejected on the Slingluff patent, No. 1,544,947. These various grounds of rejection will be briefly discussed.

Claim 50, as it reads, includes the element of "heated strips mounted in spaced relation on the carriers and adapted to register on opposite sides of the glass sheet during the movement of the carriers." Both tribunals in the Patent Office were of opinion that this was new matter. The examiner states that, while portions of the original application mentioned the use of the strips on both sides of the sheet, it at no place disclosed the idea of having them register with each other. The examiner also calls attention to the fact that Figure 6, which seems to show such a registration, was not a part of the original drawings with the application, and that it was required to be canceled. The examiner also calls attention to the fact that Figure 1 of the application, as originally presented, showed strips upon one belt only. This is apparent otherwise from the proceedings in the Patent Office. For instance, in an amendment of March 2, 1929, the appellant alludes to the fact that in Figures 4 and 5 he has shown the heating strips to be applied to one belt only.

Inasmuch as the statement certified by the Patent Office to us must be assumed to be correct, and in view of the fact that the appellant does not claim to the contrary, we must conclude that this feature of the registration of the heated strips was not originally included in the application. Therefore it seems that the tribunals of the Patent Office were entirely right in concluding that it was, and is, new matter.

It is argued by the appellant that he did disclose heated strips on opposite sides of the glass sheet. Assuming that this is correct, such a disclosure would not justify the language of claim 50 heretofore quoted.

The Oxford Dictionary thus defines the verb "register": "4. To coincide or correspond exactly. * * * To adjust with precision, so as to secure the exact correspondence of parts."

Heated strips might be opposite to each other, but it does not follow that they would be in register with each other.

The reference Campbell shows a machine for making and cutting glass sheets or plates. In Campbell's device, the glass is drawn between endless belts which have blocks, by which the sheet is continuously nicked along the outer edges. At spaced periods, where it is desired to cut the sheets, transverse bars of high electrical resistance are introduced into the endless belt. As these travel with the glass, they are heated for a certain distance of travel by electrical current received from contacts properly disposed along the sides, and within the ends of which bars are certain knife edges and oppositely disposed contact bars adapted to register with said knife edges. The operation of the machine is such that, as the glass plate is carried forward to the point where it is about to be severed, the glass is heated and nicked by this travelling bar in the endless belt to such an extent that, upon the disengagement of the bars from the glass, the glass sheet above the nicked portion is easily broken off and disengaged. The inventor recites, in his specification, that the sheet may be cut into any desired length, "as it is apparent that by changing the position of the gripping bars, the cutting action can be made to take place at any desired point according to the size of the sheet desired."

On inspection of said claims 51 and 55, it will be observed that such claims will read directly upon Campbell's disclosure.

Slingluff's patent, No. 1,373,533, discloses a machine for drawing glass plates or sheets from the molten bath, and for cutting the same into desired lengths. In order to accomplish this, Slingluff places across the sheet of glass flat strips of nichrome, which are heated by electricity and are caused to come in close contact with the plate of glass at the point where it is desired to cut the plate. Electrical contact is maintained long enough to heat the strip of glass under these nichrome strips. Then the contact is broken and the strips removed from the sheet of glass. Immediately thereafter, some point upon the line of heating of the glass is cooled by applying moisture or cold air, which causes the sheet to crack transversely. This constitutes the nonnicking crack-checking strip mentioned in said claim 54. While it is argued that this reference will not, in fact, stop cracks, the claim, it is thought, will read upon Campbell in view of Slingluff.

Claims 58, 59, 62, and 63 are for a method of annealing glass. It is believed that the decision of the Board of Appeals that these claims are anticipated by the references was free from error. The reference Slingluff, No. 1,544,947, discloses an apparatus for drawing glass from a bath in sheets between a pair of refractory belts, from thence into a chamber where the glass is reheated to a degree less than its original temperature, from thence into another pair of endless belts, and thereafter to a point where it is completely annealed and may be cut. As to the chamber where the glass is reheated, Slingluff's specification recites: " * * * One side of the chamber is removable for giving access to the chamber. One purpose of this chamber is to permit of the application of additional heat to the chamber, for annealing purposes, if this becomes necessary, and a second purpose is to provide opportunity for the removal of broken glass in case the sheet breaks above the endless belts 11. In case such breakage occurs, the broken places fall down into the chamber and can be removed without stopping the draw. Two sets of belts are illustrated and one intermediate chamber, but it will be understood that more sets of belts and chamber may be used if desired or necessary. The glass is cut off by operators standing upon the platform 15 and removed to the cutting room. No further annealing or flattening is necessary as the sheet is drawn flat by reason of the means as heretofore set forth, and the belts of asbestos hold the heat long enough to give it necessary annealing."

It will therefore be seen that Slingluff had in mind more than one heating chamber, if desired, so that the various steps of heating and cooling which are provided for in said claims 58, 59, 62, and 63 are disclosed by this reference.

This disposes of all of the rejected claims except claim 56. This, it is said, is rejected on Campbell, in view of Slingluff, No. 1,373,533. However, we are unable to agree with this conclusion. Said claim 56 includes the element of a nonnicking flat strip, which is electrically heated, and which said strip so electrically heated is in contact with the surface of the drawn sheet *while it is being cut.* Slingluff, as has been before noted, does not disclose a strip or strips in contact with the sheet while it is being cut. Neither does the reference Campbell. In both cases, the electrical contact and heating do not exist while the sheet of glass is being cut. In view of this quite essential feature, which is lacking in the references, it would seem that this claim should have been allowed. In conclusion, it is the opinion of the court that the decision of the Board of Appeals should be, and is, affirmed as to claims 50, 51, 54, 55, 58, 59, 62, 63, and is reversed as to claim 56.